51 CCPA
**Application of Paul ESSELMANN, Hermann Fischer, Michael Wienand and Adolf Ristau.**

**Patent Appeal No. 7206.**

United States Court of Customs and Patent Appeals.

June 25, 1964.

Burgess, Dinklage & Sprung, New York City (Arnold Sprung, New York City, of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Fred W. Sterling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals sustaining the examiner's rejection of appealed claims 13–17 as unpatentable over certain prior art. The statutory basis of the rejection is 35 U.S.C. § 103.

Appellants' application,[1] as indicated by its title, is concerned with the "Production of Shaped Objects From High-Molecular [Weight] Polyolefins." Although some of the claims are drawn broadly to "polyolefins," it will be more convenient for purposes of this opinion to speak solely in terms of polyethylene, especially since appellants, for purposes of this case, do not contend that there is any patentable distinction between the various types of polyolefins disclosed.

As background, which will be helpful in understanding the significance of appellants' claimed process, it appears that there are two basic ways of producing polyethylene: 1) by high pressure polymerization, which results in relatively low molecular weight polyethylene; and 2) by low pressure polymerization, which produces relatively high molecular weight polyethylene. The high pressure polymerization process appears to have been known for some time prior to the development of the low pressure process. It was also known, prior to the time of appellants' invention, that the tensile

1. Serial No. 547,023, filed November 15, 1955.

strength and breaking strength of *high* pressure polyethylene could be increased, and the percent elongation at breaking point decreased by drawing the material. Drawing simply involves stretching the material to a certain non-reverting elongation.

Appellants' claims are drawn to a novel process for drawing *low* pressure polyethylene. The low pressure polyethylene is subjected to a draw ratio (drawn length divided by initial length) of from 6 to 20 at a temperature range of from just below the flow temperature of the material to 90 centigrade degrees below the flow temperature but not below 90°C. The drawing is effected after the material has been extruded, at its flow temperature or above, in the form of filaments or films. Appellants assert that their process results in a polyethylene having an unexpectedly high tensile strength and breaking strength and an unexpectedly low percent elongation at break.

Claim 13 is representative of the claims on appeal and reads as follows:

"13. In the production of objects of low-pressure polymerization produced polyolefins, having a molecular weight of at least 40,000, by extrusion at least at their flow temperature, the improvement which comprises drawing the extruded polyolefin to at least six times its original length at a temperature within the range of from below said flow temperature to 90° below said flow temperature but not below 90° C."

The remaining appealed claims, 14–17, are dependent on claim 13, and merely define variations on the basic process. Appellants do not contend that the claims are in any way patentably distinct, and we shall therefore treat them as one for purposes of this appeal.

The appealed claims were held by the examiner to be unpatentable over the following prior art patents:

| | | |
|---|---|---|
| Perrin et al. | 2,210,774 | Aug. 6, 1940 |
| Martin | 2,367,173 | Jan. 9, 1945 |
| Tulloss | 2,763,029 | Sept. 18, 1956 |

Perrin relates to the production of threads and fibers from *high* pressure polyethylene. The specification indicates that subjecting such fibers to cold drawing results in a product which is stronger and more pliable than the unworked material, and specifically states that:

"Fibers or threads of high strength can be obtained by selecting as the initial material a polymer of relatively high molecular weight and/or employing conditions which ensure a definite orientation of the molecules along the fiber axis. Such conditions are to draw out the relatively unoriented thread in the cold, when the length increases and the diameter decreases. During the drawing process, the molecules become more and more oriented in the direction of pull, and finally maximum orientation is obtained when the thread has been extended above five times its original length. * * By cold drawing as the term is used herein we mean permanently elongating filaments, etc., at approximately room temperature [20° C.] or at temperatures below their softening point."

Thus, while Perrin teaches drawing high pressure polyethylene at a temperature which may range between room temperature and the softening point, with a draw ratio of about 5, it is to be noted that there is no suggestion as to what the disclosed treatment would do to *low* pressure polyethylene.

Martin also deals with a process for extruding *high* pressure polyethylene and discloses drawing the extruded material

to the maximum extent possible in a water bath maintained at 75–80°C. The patent contains no disclosure as to what "the maximum extent possible" is, in terms either of percent elongation or draw ratio. As with Perrin, we likewise fail to find in Martin any suggestion that *low* pressure polyethylene could or should be substituted for the *high* pressure material disclosed.

Tulloss discloses a method for producing an optically clear polyethylene film. The specification states that:

"It has been found that polyethylene films can be made optically clear by orientation, as aforementioned, by means of stress working the film at a temperature below the melting point of polyethylene. The simplest means of stress working polyethylene films is by stretching the film."

The material used by Tulloss is *high* pressure polyethylene, and the temperature, although described generally as "below the melting point of polyethylene," is said to be preferably between about 49° and 88°C. Again, there is no suggestion that *low* pressure polyethylene would be a suitable material for use in such a process.

In setting forth the specific ground of rejection, the examiner stated:

"Claims 13 to 17 are rejected as unpatentable over Perrin in view of Martin, Tulloss and applicants' admission that high-molecular weight, low pressure produced polyolefins were known prior to applicants' discovery. No invention is seen in carrying out the process of Perrin et al substituting the admittedly old high-molecular weight polyolefin for the low-molecular weight polyolefin of Perrin et al. It is held that one skilled in the art working with high-molecular weight polyolefins would look for guidance to the prior art discussing low-molecular weight polyolefins. It is held that the disclosure of Perrin et al suggests applicants' claimed process by calling for sufficient stretch to produce max-

imum orientation and temperatures below the softening point of the polyolefin. Even in the absence of the teaching of Perrin et al to heat while stretching it is held that Tulloss clearly teaches that heating to facilitate stretching of polyolefin is desirable. It is held Martins' teaching that a polyolefin filament should be drawn to the maximum extent possible in a heated medium teaches applicants' high degree of stretch. It is held that determination of applicants' broadly recited operating conditions involves no more than routine testing following the procedures suggested by the references applied above.     *     *     *"

This rejection is essentially one for obviousness under section 103, although it employs the term "no invention" and is based on a mode of analysis no longer authorized by the statute. It will be observed that the examiner did not clearly point out the *differences* between the prior art and appellants' claimed process. Thus the rejection, which was affirmed by the board, did not accord proper consideration to what seems to us to be an important difference between high and low pressure polyethylene with respect to drawing. As pointed out in the affidavit of Dr. Neuschaffer, an expert familiar with the art, when *high* pressure polyethylene is drawn, the tensile and breaking strengths *decrease* as the drawing temperature increases. However, as Dr. Neuschaffer's test data shows, in the case of *low* pressure polyethylene, the tensile and breaking strengths *increase* with the drawing temperature. This apparent anomaly does not appear to be the type of difference which would have been obvious under the conditions specified in section 103. Instead, it appears to have been observed only upon comparative testing of both types of polyethylene after subjecting the materials to various draw ratios at various temperatures.

Thus, while it is true that the prior art teaches drawing of *high* pressure polyethylene at temperatures near those

employed by appellants, nowhere in the art is there a suggestion that higher drawing temperatures would produce better results with respect to strength, even with *high* pressure polyethylene. Indeed, the test results set forth in the Neuschaffer affidavit indicate exactly the opposite. And we find nothing in the art which would have made it obvious to one of ordinary skill that the temperature response in the case of *low* pressure polyethylene would be the unexpectedly superior strength characteristics first disclosed to this art by appellants.

For the foregoing reason, we reverse the decision of the board.

Reversed.

WORLEY, C. J., concurs in the result.